The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention that the Court is now sitting, God save the United States and this Honorable Court. Good morning, everybody. We're going to commence this morning with case number one, United States v. Howell. Case number is 18-3157. Mr. Henderson, we'll begin with you, and we trust that you are feeling well. I am. I had the flu for about a week, but it's over now, and I appreciate everybody's care and understanding. You look much more like yourself this morning. I hope so. It may have pleased the Court. I am Peter Henderson. I represent Anthony Howell. I'd like to start where we were discussing last time about the scope of the Court's review. And the cases seem to indicate that there are instances in which consulting the trial record is appropriate. I'm going to suggest this is not one of them. In United States v. Longmire, the Court observed that, in general, the trial record can be relied on to sort of buttress the suppression record, unless, you know, if a witness's veracity or credibility has been called into question by the defense, then, as the Court noted, perhaps the appellate court should decline to consider that testimony. And of all the testimony that we've heard here, really the one witness that we have consistently challenged the credibility on is Officer Kelley. And so, to the extent that Officer Kelley offered additional information that would support reasonable suspicion at trial, that was never part of the factual record that the district court addressed in the post-trial motion that the government advanced in either the motion to suppress hearing or the response to the post-trial motion. Was that ever advanced in the, after the trial, when you renewed your motion at the close of the evidence? I didn't see it in the transcript, but I wasn't sure. I don't think so. I mean, what happened after the trial was defense counsel filed a motion for a new trial and said, well, even Officer Kelley's testimony here didn't do anything, but didn't specifically identify additional facts. I think everybody was operating under the assumption that this was essentially the same record that we had looked at at the motion to suppress hearing. Perhaps foremost, the district court judge. I'm sorry? Perhaps foremost, the district court judge. Right. I mean, he summarily denied the motion. And did so, if memory serves, by saying he just incorporates by reference the prior ruling. Exactly. And so that, you know, it's, to me, it's more a question of appellate procedure and the proper role of, you know, what this court has to do is determine, first of all, what the law is and then apply it to the, really, the facts. And when the facts are in dispute, it can't really do that role. And so, we think that the court really ought to focus on the facts that were presented to the district court. And that includes, for example, the government's new argument on appeal that this was somehow a call for a burglary. It's not supported by the record, but the place to make that argument is in the district court. And absolutely nobody mentioned the burglary in the district court. The 911 operator thought this was a criminal trespass. We don't know why. That information's not available to us. But under collective knowledge, that knowledge is passed on to the officers who all thought they were responding to a criminal trespass. And so, this burglary argument just isn't supported. It's not something you can come up with anew on appeal. Let me turn to... Can I ask you a question on that point? I just want to get your reaction to this. I don't know if you go too far or not in your brief. You can tell me you don't on the point of misdemeanor versus felony conviction. Because I worry about this at a very practical level. There's a 911 call gets transmitted to the police over the radio. And I really worry about a rule under the Fourth Amendment that requires officers responding to a 911 call to try to catalog are we responding to a felony or are we responding to a misdemeanor? So, you can go ahead and respond to that. I'll have something else to say. So, in this case, I think it's very clear that they understand this is a misdemeanor. Because it appears, at least, that the 911 operator puts out a call and assigns basically what they think it is. They assign that this is criminal trespass. The information that they've gleaned... Well, criminal trespass, that's a different word than misdemeanor. It's not that the operator didn't say, hey, look, there's a cabinetry, get over there when you can. But your broader point, I think, which is fair, is that, look, they're not responding to shots fired. They're not responding to a report of an explosion. They're responding to what's a relatively low-end crime. And that's why we don't think the Sixth Circuit was right to say, misdemeanor, no, Terry. You know, never. The Eighth Circuit and the Tenth Circuit have both addressed these criminal trespass cases. And in one, it was not reasonable to affect a Terry stop, where there really was no additional information to suggest that there was still a trespass going on. Your position is that the misdemeanor is something that should just be taken into the totality of the circumstances, correct? Not that, as you say, what the Sixth Circuit did, that a completed misdemeanor never gives rise to a Terry stop. Correct. And the distinction is, a felony always can support a Terry stop. If police have reasonable suspicion of a felony, even if it's completed, they can stop somebody and investigate further. But if police suspect a lesser crime, there's not a categorical rule. They need actual reasonable suspicion to believe that there's a need for intervention that outweighs the person's interest in not being detained involuntarily. And I was focusing on something, a distinction, rather than between felony and misdemeanor, between completed and not completed. Isn't the completion nature the... That's right. An ongoing misdemeanor, police can affect a Terry stop. I mean, that's Terry. I think Terry suggests that. The question is the completed aspect of the crime. And that's what the Supreme Court addressed in Hensley, which is the interests change. Police officers, we want them to respond to ongoing emergencies, to ongoing crimes, to contemplated crimes, as in Terry. But once something is over, then the interest in privacy can outweigh those interests in quick resolution of what's going on. What's your position on when the Terry stop in this case took place? I think the Terry stop took place after the completion of the crime or ongoing. When, during the point when the police approached him, because they asked him a question first. I don't think you're saying just the mere asking of questions supports the Terry stop. When along the spectrum of when the police got there, is it your position that the Terry stop actually took place? Well, it depends. Certainly once they touch him and go to stop and frisk him. That's a question. In your mind, did it take place from your argument before then? Due to our factual dispute, if there is an order, at some point if the officer is approaching him and ordering him to do something, like take his hands out of his pockets, that could be the seizure. Because essentially what the government is saying is, he had to obey that order and the fact that he didn't obey that order means that there's now reasonable suspicion to believe he's armed. Which implies that's not a voluntary decision. So that would be the point at which the Terry stop occurs. Go ahead. But I don't think that fact happened. So I think the Terry stop starts when the officer, after the officer approaches, Mr. Howell doesn't respond and he decides, okay, I'm going to frisk you. That's the start of it. So simultaneous with the frisk? I think so, yeah. I don't see any... I mean, Mr. Howell was just unresponsive. And so there was no seizure before then. But, of course, that means we have to satisfy the two standards for both. But I think it occurred simultaneously. So I think this case is a lot like Hughes. In terms of the completed misdemeanor. In terms of the seriousness of the offense. In terms of the reasonableness of the response to that offense. And what we'd suggest is the initial police action was perfectly reasonable. Go out and investigate. But their investigation revealed that there was not a continued trespass going on. There certainly wasn't a burglary. They talked to one person outside the factory. A bunch of the factory workers arrived. There's no evidence that they thought anything was amiss. At that point in their investigation, officers have... It's not reasonable for officers to then start detaining everybody who walks down the street. And that's what appears to have happened here. I mean, the big thing that I keep coming back to is Mr. Howell didn't fit the description of the person who was given to 911. He was a different race. That's a big factor. Although he was a different race. But wasn't he of Hispanic origin? His mom had a Hispanic surname. He sometimes went by the alias of Jeffrey Martinez. Given those factors, how much weight should we put into that? Well, the officer said, Escobar is Hispanic. Howell is white. I mean, I think that answers the question. Because we're not talking about fine... Race is a very tricky subject. And academically, we'll talk about race in very different terms than somebody calling 911 and saying there's a Hispanic man across the street going under a fence. To me, that has to imply that that refers to skin color. And it refers, basically, to a brown skin color. And so when we use these sort of crude terms in law enforcement, and say white, black, Hispanic, that has to mean something. Otherwise, it's meaningless. There's the case out of the Sixth Circuit where there was a call about a black male or female had committed the crime and they stopped the driver and he was Hispanic. Well, plenty of Hispanic people have very dark skin. And you'd call them black if you saw them on the street. But that's not how we're using the words. These sorts of inquiries are common-sense inquiries. If somebody says Hispanic, you look for somebody who looks Hispanic. And the district court, who'd seen Mr. Howell appear in front of him, even said, yeah, no, Mr. Howell's white. I mean, that is a fact. Does the record indicate, Mr. Anderson, the distance between the fence and the building that was interior to the fence? I don't think it does. I was thinking about this. I mean, I've looked at Google Maps. There may be, in the government's trial exhibits, there may be some indication of that distance. But, you know, it's basically there's a sidewalk and just abutting the sidewalk is both the fence and the factory. And the fence seems to extend to the factory. I'm not even certain what fence or what garage they're talking about, though. I mean, it's a quick 911 call. Get out there. Investigate. I'm not sure those facts are really clear. We'll pose it to Mr. Erskine as well. Mr. Anderson, let me ask you to set aside some things that you don't want to set aside. And you've been very, very clear about. Just for purposes of talking this through a bit. Okay? Let's suppose we consider the trial record. And let's suppose that we credit the trial testimony of Officer Kelly that he instructed Mr. Howell take his hands out of his pockets and he declined. Why doesn't that change the Terry analysis altogether? Well, I think it changes it in a couple ways. First, as I was mentioning, I think it changes it because I think at that point, if the argument is he has to take his hands out of his pockets or he's going to be frisked, then that's a seizure. Because he's then subject to basically an involuntary decision to either take his hands out or be frisked. So he's seized. And so we have to go to before that time to determine whether there's reasonable suspicion that he is associated with this past criminal trespass involving a Hispanic man. I don't think there is. It might add something, right? The concern about hands in pockets is, is this a benign sort of, it's cold outside, it's December, I have my hands in my pockets. Or is it I'm manipulating something in my pockets and police officers are reasonably concerned about their safety. And if there's a command to remove your hands from your pockets and the person doesn't respond, sure, that's a factor. I don't think it's dispositive, though. What we see in the other cases where we're concerned about pockets is precisely some indication that the person, A, might be armed. And that might come from the nature of the call. So if you're responding to shots fired and you order hands out of the pockets, and he doesn't take them out, at that point, yeah, we know there's been a gun involved. We're real concerned about officer safety. Mr. Howell wasn't responsive to anything, though. It's not as if he was perfectly compliant and then, all right, take your hands out of your pocket. I'm keeping them in. Maybe that adds some more suspicion. It's certainly a factor. That's undeniable. I don't think, though, given the nature of the call, given the mismatch of the description between who the suspect was and Mr. Howell's race, I don't think that that is something that allows a police officer to frisk. Because then the officer could have asked anybody on the street that day who's wearing a black hat and a black jacket, which I think describes a lot of people. And if they don't obey his commands that he doesn't really have authority to give, suddenly they're frisking everybody. Did Officer Kelly's testimony at the trial about the hands in the pocket conflict with what the district court considered at the suppression stage from Officer Kelly? I know there wasn't a hearing. The court was just looking at the 302s and the police report because an issue of fact hadn't been raised. Right. But did his testimony actually conflict with something that Officer Kelly was reported as saying in those reports? Or did it conflict with another officer's testimony? I think it sort of conflicts by omission. I mean, Officer Kelly in his report basically said, you know, described Mr. Howell's demeanor, said he posed him questions and in particular what at least the government focused on was, you know, what are you doing, et cetera, and he didn't respond. And so he then stopped and frisked him. So in a sense it doesn't you could find a way, I think a judge could make a finding to say, this is consistent. But on the other hand, if that is such if that's the motivation for the search, you would expect that Officer Kelly would say, he had his hands in his pockets. He didn't take them out. I asked him to. I was concerned for my safety. That's the critical fact. Although he didn't have the opportunity to address that, did he? Because he didn't testify at a suppression hearing. Well, no, but you would think in a police report in a 302 when you're recounting the salient facts of why I stopped and frisked somebody it's, I thought he had a gun in his pocket because he had his hands in his pockets and he didn't take them out. And I asked him to and he wouldn't comply. So, you know, I don't think it necessarily conflicts, but I would expect to see that sort of detail if that is the sort of most important detail in justifying the stop and frisk. I think this exact colloquy is what makes Lawnmire important. And what I mean by that is the concern that I have here is from Mr. Howell's perspective, post pretrial the motion to suppress is ruled upon. It's done. He lost it. He wished he would have won. He didn't. He lost it. And Lawnmire expresses a concern that a defendant would reasonably conclude that that part of this is over. And then we go to trial and here we have testimony that I think adds something that's quite significant. At least in my judgment it is, you know, get your hands out of your pockets. I need to see your hands. And he declines at a point in time where a defendant has no reason to believe that that testimony is still in play vis-a-vis the Fourth Amendment question. And that's what concerns me here with looking at the trial record. I think that's right and that's exactly why even when looking at the trial record may sometimes be permitted in this case that's not the prudent course. The other thing too is, you know, we have some discrepancies in the demeanor evidence. How Officer Kelly describes Mr. Howell at trial is slightly different. He uses different terms. This is also maybe five years later, six years after the incident. But that's what's concerning because of course, you know, contradictions between the 302 and trial testimony is right for cross-examination. But why would you cross-examine on what was his demeanor? The cross-examination is essentially did you plant the gun or not? That was sort of the only defense. But that's exactly right. At this point, that issue is done. He raised a pretrial and a motion to eliminate to exclude it. It was summarily denied for the same reasons I already gave. At this point, there's no incentive to test that. So we think that really it's a burden of proof point. If the government's got a burden of proof to establish something at a particular point in the proceedings, that's when they need to establish it in general. I will reserve my remaining time for rebuttal. Very good. Thank you, Mr. Henderson. Mr. Erskine, we'll turn to you. May it please the court. The district court correctly denied the defendant's motion to suppress. Following the 911 call, the defendant was in the right place at the right time, wearing the right clothes. He did a quick double take at Officer Kelly and he had a look of panic on his face. A stunned look with eyes wide. Officer Kelly asked him what's going on and the defendant didn't respond. Instead, he moves his hands into his pockets. The officer then instructs him to remove his hands from his pockets and the defendant does not do as requested. So it's your position that he first moved them in and then kept them there and when he was asked to remove them, he didn't take them out. It sounds like you're trying to combine the suppression hearing and the trial testimony. That's how I interpret the evidence. That is, and I will of course address the issue of scope of the evidence for this court's review, but that is how I interpret the evidence offered by Officer Kelly. Are you asking us to look at the trial testimony? You didn't ask that below and you didn't ask that in your initial briefing. It was something we raised when you were here previously. Is that something you're asking us to do? Correct, yes. The court was correct to raise that issue when we were last here and the government is requesting that this court consider the evidence introduced at trial in ruling on whether to affirm the motion to suppress below. Have you waived that argument by not raising it below and not raising it in your briefs here? Well, to be fair, we did raise that in our standard of review in our response brief. We cite, I believe, we do cite cases to the effect that the entire record is in play. But you didn't identify that particular testimony in your brief. We did not identify that particular testimony. You may have made a broad legal statement that we could consider everything, but you didn't identify the particular testimony of Officer Kelly at the trial or ask us to rely on that. We did not identify the particular testimony of Officer Kelly. We did talk about the trial testimony in the same fashion, to the same degree as the appellant did. But Your Honor is correct that we did not specifically speak about that, the line of testimony that he had instructed him to, the defendant, to remove his hands from his pockets, and he did not. So given that, have you waived your right to rely on that now? I believe in light of the citation to the proper standard of review and the invocation of the trial testimony in the response that we have not waived it. So would that suggest that it's up to us then to go through the trial record to figure out what relevant testimony if you don't identify it for us? You know that's not the standard. That's not the standard, and the better practice would have been for the government to identify a particular line that is correct. It's not up to Your Honor to comb through the entire trial record. Mr. Erskine, the reason that I don't think you raised it, you don't have to respond to this, I'll just say it as part of asking you a question. The reason that I don't think you raised reliance upon the trial record is because it's counterfactual. What happened here was this was all a litigated pretrial on a record that of course did not include the trial and didn't include the hands out of the pockets point because that came up at trial when Officer Kelly testified. And so everyone thought that the district court resolved this pretrial on a particular record and that's the way it all came up to us. And the concern that I have now on appeal about pivoting to include the trial record, which in my view contains a very different and very material fact, this point about the hands coming out, is that it runs into the concern about prejudice that sounded in Lawnmire. That ship has sailed pretrial. And so if at trial there's evidence that is brought out that is kind of trying to bolster or reinforce the pretrial ruling, the defendant has no notice of that, no incentive to litigate it whatsoever. It's prejudicial to a guy in Howell's position. That's the point I'd like you to respond to. Yes, Your Honor. So I guess I would say in response to that that there was an incentive. So Lawnmire identifies the possible prejudices and then for the one Your Honor has identified says in effect that the defense bar has been on notice since such and such date in light of the Seventh Circuit's precedence. Don't you agree though, just as a matter of table setting and then you can continue, that Kelly's testimony bolsters the pretrial ruling? It helps you. It doesn't hurt you. That's correct. Okay. And so why doesn't that play right into the concern about prejudice that's discussed in Lawnmire? It does play into it insofar as, well, allow me to say this. It's unfairly prejudicial if the defense lawyer does not have an incentive to address it. But in this case, the defense lawyer did have an incentive to address it. To the extent there's a discrepancy in the testimony of the key officer, and that differentiates from the 302 recording of prior interview of that officer, that defense attorney has an incentive to seek to impeach and perfect the impeachment on that count. Perhaps the question goes to, would the cross-examination have differed? If? If there had been notice about the additional fact. If? Meaning if the cross-examination is being prepared for purposes of Officer Kelly. Defense doesn't know about this additional fact with regard to the hands and the pockets. There's going to be a cross-examination of the lead witness. How and if is the cross-examination going to differ as a result of notice of the additional fact? So you're saying if in the trial preparation, separate from the initial 302, if during the trial preparation this fact had come out and had then been documented in the 302, and that 302 were turned over, how would that have affected the cross-examination? I imagine the defense lawyer would have asked questions, essentially the same questions. It would not have, I don't think it would have played out too differently, but that's not to say in the way that it did play out, the defense lawyer did not have the incentive to try to impeach Officer Kelly, to try to make it look as though his story had changed. Because Judge Scudder's concern, which is absolutely a fair one, is theoretically that in suppression you're considering sort of one concern and you go to trial and that shifts, but this is not a situation where that occurred. And there's going to be a lot of overlap between the two focuses of interest, between a suppression context and a trial context. And then I will just note once again that Longmire itself held that that was, it overruled that argument of prejudice and the only one that really left open was the one that Appellant's counsel raised, which was the idea of whether or not the witness' testimony has really been attacked, his credibility has really been attacked. So the other concern that I have here is, I don't have any idea whether the district judge believed Officer Kelly or didn't believe Officer Kelly on the hands out of the pockets. And the reason, of course, is because the trial all the district court judge said was, I'm incorporating my prior reference by ruling. But it's a pretty material addition to the 302, it's a pretty material addition to the police report, in my view, that, hey look, I told the guy to take his hands out of his pockets and he ignored me. That's not in the police paperwork, that's of course what the officer testified to at trial. The district court judge may have believed the testimony, he may not have. We don't have any idea. And what you're asking us to do here is to credit that as part of this appellate review of the Fourth Amendment analysis, district court never considered it. It just doesn't seem in keeping with the way we conduct review. We have discretion here. Yes, Your Honor. On that point I would say that two things. The first is, the way this played out procedurally in going back to the first concern you raised, I think this really shows why it's not a situation of, it would not be unduly unfair or unfairly prejudicial at this point to consider that subsequent testimony by Officer Kelly because the Fourth Amendment issue was raised again post-trial. And so at that time, to the extent there was any daylight between defense counsel's interest during the trial. But raised for five seconds. I'm sorry? Raised for five seconds. Judge Feinerman said, I've already ruled on this, haven't I? He said, oh yeah, you ruled on it. He said, well, I'll incorporate my prior ruling. I believe the defense filed a motion, a paper motion as part of a motion for a new trial. Oh sure, you're 100% correct. They renewed it, right? But the district court judge just said, hey, we're done with that. I dealt with that pretrial. So I guess the two things, again, I'm speaking really to the fact that the post-trial briefing gave the defense counsel again the opportunity to address the same concerns that would have occurred, been present during the suppression moment of the procedure. But then with regard to Judge, the district court judge specifically, he sat through the entire trial. He obviously read and considered the arguments again post-trial by defense counsel. And after having gone through that, the district court felt comfortable denying it and invoking and relying upon the rationale he'd previously articulated. But that fact was never brought up to the district court. And defense counsel didn't bring it up. It's not helpful to defense counsel. The government didn't raise it in opposing the post-trial motion. So there's no indication that the court, it was on the court's radar at all. So as I understand the concerns, because obviously Longmire sets out the policy reason why it should be considered. Because there's the risk of an undue windfall to the defendant of having his conviction overturned. So that's the policy reason to consider the trial evidence. That's where the evidence at trial casts doubt on a pretrial suppression ruling. Here it bolsters it. No, I don't believe that's correct, Your Honor, because I think in Longmire itself... An appellate court must review evidence presented at trial that casts doubt on the correctness of the pretrial suppression ruling. I'm quoting from Longmire. I believe the facts of Longmire, unless I'm confusing the cases, I believe the facts of Longmire are one in which there was an officer who was not called in the suppression hearing and then he testified at trial. The government sought to rely on his testimony to sustain the denial of the motion below. The defense tried to prevent that and Longmire affirmed the district court's decision to... I'm sorry, the Seventh Circuit considered that testimony and held it's okay here for this policy reason notwithstanding these possible prejudices. So I think there's sort of two versions of this situation. One in which the defendant is trying to use the trial testimony to attack the denial and there's cases in that context that say only if the defendant has renewed the motion is that allowable. And then Longmire which says it can be used to sustain the denial in light of this important policy reason of avoiding a windfall to the defendant. If I may proceed. So a couple points. Can I ask you a question about the merits of it? I know we're talking about the record part of this is important of course and it's important that we cover it. But if we limit the review to the pretrial record, I know that's not what you're urging but if we do that, okay? Are you concerned at all that this is too close to Florida v. J.L.? I'm not because the difference is in Florida v. J.L. the defendant who was approached by the officers did not do anything in that encounter to specifically provide additional reasonable suspicion whereas this defendant did. In the way that Officer Kelly approaches him, he has a look of panic and he does the quick double take and look of panic being more than nervousness. He does the double take, look of panic, approaches him and says what's going on? No response. In addition to no response, he moves his hands into his pockets. So the look of panic, the double take, the no response and the hands into the pocket are all individual things the officer perceived directly which were not present in the Florida case. Florida though, you got an anonymous 9-1-1 call similar in that regard, right? Where the caller describes the person to a T and says he's got a gun. Right? Much more serious 9-1-1 call than you have here. Correct. I mean, right? I mean here there's nothing about somebody being armed. There's a call about a commercial trespass is what it sounds like. But the court has real trouble with that stop and by extension, the pat down. It's crystal clear from the call that, at least according to the caller, the guy has a gun and he fits the description. Right. Yeah, and so that case is the controlling Supreme Court precedent on the category of cases that involve anonymous 9-1-1 calls and nothing else. So the reason I'll be totally transparent with you, the reason I'm thinking about Florida versus J.L. is I know that our defendant here is not Eric Escobar. Correct. Right? Our defendant is Howell. Correct. Okay. But the very first thing that happens when the squad car arrives is they get out and they just pat down Escobar. They just pat him down because he fit the description. Right? And I think that's a Florida versus J.L. problem. You would respond to that and say he's not the defendant. Right? But there's a lot going on here that it looks like a very quick kind of trigger on the pat down. With both people. With Escobar and Howell. I mean, we have the benefit here in the courtroom of you very appropriately kind of going frame by frame through what happens. But when you look at the record and you look at the way this is described, I mean, it is bang, bang. I agree it's bang, bang, as is police work very often. And I would suggest that it's bang, bang, but as to the defendant who was ultimately charged, bang, bang was sufficient information developed along the way where it ultimately was constitutional. As to Mr. Escobar, even Mr. Escobar himself said, what about that guy? He matches the description too. Well, sure. Because if you're Escobar, you're going to be like what are you guys doing here? He was going out to a 7-Eleven or something. Right? So he doesn't know and he, I don't know, maybe that guy. Maybe that's who you're looking for. I don't think it was a framing or anything like that. I think it was Escobar like well, it sure ain't me. Oh, no. I don't think it was a framing either. That was not what I was interested in. I know. Nobody's saying that. So I think that, you know, and then Kelly's probably, well, all right, maybe it is him. I don't know. Let's go over and talk to him. And then it's not a discussion. It's a very, it's almost an instant pat down. As to? As to Howell. Instant, but with the knowledge about the 9-1-1 call, the matching of the description, the time, the location. A petty 9-1-1 call. I would disagree, Your Honor, because it's important to look at the 9-1-1 record itself and it describes it as a man climbing under the fence at a warehouse. So, and this is what the point I was making. I mean, if you, if you tally the 9-1-1 calls to the 9-1-1 operators in Chicago, I think they'd say that's closer to the cat in the tree than it is the shots fired. That's low end. I would suggest it's in, perhaps in the middle of those two because, again, a person, why does a person climb under the fence at a warehouse? It's not just to go for a walk. It's to. Happens all day, every day. And they're like, well, we've got to respond. Of course we've got to respond. Let's figure out what's going on. But it's not, they're not responding to a report of a weapon, a violent crime in progress, anything like that. Absolutely. Stipulated. And the government is not suggesting that the call alone could have supported a stop. Of course not. If they had, if the officers had showed up on the call alone and encountered Mr. Howell and he did not have a look of panic and he did not give the double take and if he did not move his hands into his pockets in response to the request of Officer Kelly, there would not have been reasonable suspicion sufficient to support the stop and freeze. On this question of the proximity of the factory to the fence, does the record say anything? Same question I asked from Mr. Anderson. It does not. As far as I can tell. Briefly on the question. Before you move on, what's your position on when the Terry stop actually occurred and do you think it was different from when the frisk took place? The moment his hands touched Mr. Howell is when it began because Mr. Howell did not. And that's when the Terry, just pure Terry stop, not the frisk. The seizure. Because he had not submitted before then. So that's the moment the seizure occurs. And then And just on the question on the issue of Hispanic versus Caucasian and I agree with counsel for the appellant that it's a tricky issue to discuss. But as Judge Staney even noted, it does appear that he is in fact of Hispanic origin. And the judge considered this argument. The district court judge considered this argument and concluded that any discrepancy did not preclude the reasonable suspicion in light of all the other factors that we've been talking about and that the district court articulated in his reasoning. And the government agrees with that assessment. Should it impact our decision that he wasn't carrying a black bag either? That was part of the 911 call. A black bag is easily dropped. So I would argue that this court should put very little weight into that. It would be different circumstance if it were different clothes, which can be changed but with more difficulty than merely dropping a bag. And I see my time is running out. So the government would ask that this court affirm the decision below. Thank you, Mr. Erskine. Mr. Henderson, rebuttal. I just wanted to pick up on two points. One, I think we've correctly identified that the scope of review revolves around this question of prejudice. And normally in appellate review, we often think of this in terms of waiver and forfeiture. The reason those doctrines exist in some part is because you prejudice an appellant or an appellee or any party on appeal if you will that weren't fleshed out in the district court. And I think that's especially true here where we have until the oral argument, Mr. Howell never considered that maybe the dispositive fact is what Judge Scudder identified. That's the prejudice here and we think that that's . . . Carroll talks about the defendant's substantial rights. Longmire talks about when credibility comes into issue. We identified three different ways why Kelly's not credible. The demeanor stories changed between 302 and at trial. The direction of travel that Kelly says Mr. Howell was walking in conflict with every other witness. And Kelly in his 302 omitted any mention of the stop and frisk of Mr. Escobar. Officer Kelly, in my view at least, knew a little bit more about how to make sure his stops were going to be okay. And you see Miller come in and testify, oh yeah, well of course we stopped and frisked them. We don't know if they have a weapon. That's what we have to do as police officers. The invocation of Florida v. J.L. I think is very interesting. In Florida v. J.L. we actually had an exact match of the suspect. Here we don't even have that. And so I think that we just don't have reliable information to link Mr. Howell to any offense. The fact that he may have appeared nervous on the street doesn't supply any more reliable information. So we'd ask the court to reverse. Thank you. Thank you Mr. Henderson. Thank you Mr. Erskine. The case will be taken under revisement.